

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Norfolk Division

SWIMWAYS CORPORATION and
VAP CREATIVE, LTD.,

     Plaintiffs,

v.                    Case No.: 2:13cv334

ZURU, LLC,

     Defendant.

## OPINION AND ORDER

This matter is before the Court following a Markman hearing, conducted for the purpose of construing five disputed claim terms of the patent-in-suit. After careful consideration of the briefs submitted by the parties and the arguments advanced at the Markman hearing, the Court issues the following Opinion and Order detailing the claim constructions in this case.

### I.   FACTUAL AND PROCEDURAL HISTORY

At issue in this case is a single patent titled "Self-Propelled Figure," U.S. Patent No. 6,860,785 ("the '785 patent"). The '785 patent was filed on June 13, 2002 as Application No. 10/167,410 and issued to Vap Creative, Ltd. ("Vap") on March 1, 2005. SwimWays Corporation ("SwimWays") and Vap (collectively "Plaintiffs") allege that SwimWays "is an exclusive licensee, from Vap, of the '785 patent." Compl. ¶ 2, ECF No. 1.

## A. The '785 Patent

The '785 patent's abstract describes the "Self-Propelled Figure" as a "figure that is configured to be propelled through a liquid." Compl., Ex. A at Abstract, ECF No. 1-1 [hereinafter "'785 patent"]. "The figure includ[es] a torso, a flexible appendage coupled to the torso, and a drive configured to move the appendage with respect to the torso." Id. The '785 patent's specification further describes the figure as "a water toy, such as, a fish or a sea turtle, that can traverse through a liquid, such as water." Id. at 1:6-7. The specification acknowledges that "water toys that simulate animals have been developed," and that "[s]ome [such] conventional water toys . . . include moving appendages that propel the toy through liquids." Id. at 1:10-14. However, the specification states that, unlike the appendages of conventional water toys, the "appendage [described in the '785 patent] is configured to flex while [it] is moving with respect to the torso." Id. at 1:23-26; 1:61-64. Thus, unlike the appendages of the "conventional water toys," which "do not have life-like motions," id. at 1:14-17, the combination of "relative motion and the flex of the appendage effectively propel[s] the toy figure through the liquid and provide[s] the appendage with life-like movements," id. at 1:26-29; 1:64-67.

Figures 3-7 of the specification "illustrate the toy figure 100 disposed in a liquid at different stages of the relative movement between the torso 120 and the appendage 160." Id. at 2:25-30. The figures depict the relative movement as "a reciprocating pivotal motion with the appendage 160 pivoting about an axis 126 that is located at the rear of the torso." Id. at 2:25-30. "Because the flexible portion 164 of the appendage 160 flexes and bends as the appendage 160 moves with respect to the torso 120, the movement of the flexible portion constantly lags the motion of the rigid portion 162 of the appendage," which the specification describes as "a wave-like, whipping motion." Id. at 3:13-19.

## B. Procedural History

Plaintiffs filed the instant action against Defendant Zuru, LLC ("Zuru" or "Defendant") on June 14, 2013, alleging that Zuru has directly and indirectly infringed the '785 patent by manufacturing, distributing, selling, offering to sell, and/or importing "a variety of robotic fish products, sold under the name 'Robo Fish.'" Compl. ¶¶ 12-13, ECF No. 1. On August 12, 2013, after two extensions of time granted by the Court upon consent motions filed by the parties, Zuru filed its Answer, denying any infringement, including induced or contributory, and asserting several affirmative defenses, including invalidity of the patent-in-suit, prosecution history estoppel, joinder of an

improper party, and other equitable doctrines. ECF No. 12. Additionally, Zuru alleges a counterclaim against Plaintiffs, seeking declaratory judgments that Zuru has not infringed the patent-in-suit and that the patent-in-suit is "invalid, unenforceable, and/or void under 35 U.S.C. §§ 102 and 103." Id. at 7. Zuru also requests injunctive relief to prevent Plaintiffs "from enforcing or threatening to enforce the '785 patent against [Zuru]" or any of its affiliates. Id. at 9.

On February 18, 2014, the Court held a Markman hearing, where it heard argument concerning the disputed claim terms. The Court will now address the proper construction of the disputed claim terms argued at the Markman hearing.

## II. CLAIM CONSTRUCTION PROCEDURE

In Markman v. Westview Instruments, Inc., 517 U.S. 370 (1996), the United States Supreme Court succinctly explained the basis for, and importance of, claim construction:

> The Constitution empowers Congress "to promote the Progress of Science and useful Arts, by securing for limited Times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries." Art. I, § 8, cl. 8. Congress first exercised this authority in 1790, when it provided for the issuance of "letters patent," Act of Apr. 10, 1790, ch. 7, § 1, 1 Stat. 109, which, like their modern counterparts, granted inventors "the right to exclude others from making, using, offering for sale, selling, or importing the patented invention," in exchange for full disclosure of an invention, H. Schwartz, Patent Law and Practice 1, 33 (2d ed. 1995). It has long been understood that a patent must describe the exact scope of an invention and its

4

manufacture to "secure to [the patentee] all to which he is entitled, [and] to apprise the public of what is still open to them." McClain v. Ortmayer, 141 U.S. 419, 424 (1891). Under the modern American system, these objectives are served by two distinct elements of a patent document. First, it contains a specification describing the invention "in such full, clear, concise, and exact terms as to enable any person skilled in the art . . . to make and use the same." 35 U.S.C. § 112; see also 3 E. Lipscomb, Walker on Patents § 10:1, pp. 183-184 (3d ed. 1985) (Lipscomb) (listing the requirements for a specification). Second, a patent includes one or more "claims," which "particularly poin[t] out and distinctly clai[m] the subject matter which the applicant regards as his invention." 35 U.S.C. § 112. "A claim covers and secures a process, a machine, a manufacture, a composition of matter, or a design, but never the function or result of either, nor the scientific explanation of their operation." 6 Lipscomb § 21.17, at 315-316. The claim "define[s] the scope of a patent grant," 3 id., § 11:1, at 280, and functions to forbid not only exact copies of an invention, but products that go to "the heart of an invention but avoids the literal language of the claim by making a noncritical change," Schwartz, supra, at 82. . . .

Characteristically, patent lawsuits charge what is known as infringement, Schwartz, supra, at 75, and rest on allegations that the defendant "without authority ma[de], use[d] or [sold the] patented invention, within the United States during the term of the patent therefor . . . ." 35 U.S.C. § 271(a). Victory in an infringement suit requires a finding that the patent claim "covers the alleged infringer's product or process," which in turn necessitates a determination of "what the words in the claim mean." Schwartz, supra, at 80; see also 3 Lipscomb § 11:2, at 288-290.

Id. at 373-74.

It is well-settled that a determination of infringement requires a two-step analysis: "First, the court determines the scope and meaning of the patent claims asserted" and second,

5

"the properly construed claims are compared to the allegedly infringing device." Cybor Corp. v. FAS Techs., Inc., 138 F.3d 1448, 1454 (Fed. Cir. 1998) (en banc) (citing, inter alia, Markman, 517 U.S. at 371-73).  In conducting this analysis, it must be remembered that "[i]t is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.'" Phillips v. AWH Corp., 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc) (quoting Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc., 381 F.3d 1111, 1115 (Fed. Cir. 2004)); see Vitronics Corp. v. Conceptronic, Inc., 90 F.3d 1576, 1582 (Fed. Cir. 1996) ("First, we look to the words of the claims themselves, both asserted and nonasserted, to define the scope of the patented invention.").

### A.  Claim Construction Principles

Focusing on the first step of the infringement analysis, the Federal Circuit has repeatedly stated that "the words of a claim 'are generally given their ordinary and customary meaning,'" and that "the ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention." Phillips, 415 F.3d at 1312-13 (quoting Vitronics, 90 F.3d at 1582).  This "provides an objective baseline from which to begin claim interpretation" and is based upon "the

6

well-settled understanding that inventors are typically persons skilled in the field of the invention and that patents are addressed to and intended to be read by others of skill in the pertinent art." Id. at 1313. As noted by the Federal Circuit:

> It is the person of ordinary skill in the field of the invention through whose eyes the claims are construed. Such person is deemed to read the words used in the patent documents with an understanding of their meaning in the field, and to have knowledge of any special meaning and usage in the field. The inventor's words that are used to describe the invention—the inventor's lexicography—must be understood and interpreted by the court as they would be understood and interpreted by a person in that field of technology. Thus the court starts the decisionmaking process by reviewing the same resources as would that person, viz., the patent specification and the prosecution history.

Id. (quoting Multiform Desiccants, Inc. v. Medzam, Ltd., 133 F.3d 1473, 1477 (Fed. Cir. 1998)). "'In some cases,'" however, "'the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words.'" Acumed LLC v. Stryker Corp., 483 F.3d 800, 805 (Fed. Cir. 2007) (quoting Phillips, 415 F.3d at 1314). Finally, when construing claim terms and phrases, the Court cannot add or subtract words from the claims or appeal to "abstract policy considerations" to broaden or narrow their scope. SmithKline Beecham Corp. v. Apotex Corp., 403 F.3d 1331,

7

1339-40 (Fed. Cir. 2005); see also Quantum Corp. v. Rodime, PLC, 65 F.3d 1577, 1584 (Fed. Cir. 1995) (observing that "it is well settled that no matter how great the temptations of fairness or policy making, courts do not redraft claims").

## B. Types of Evidence to Be Considered

In determining the meaning of disputed terms or phrases, the Court must first examine the claims themselves. See Phillips, 415 F.3d at 1312; Vitronics, 90 F.3d at 1582. Indeed, the Federal Circuit has stated that the claims themselves, "both asserted and unasserted," can be "valuable sources of enlightenment as to the meaning of a claim term," in part, because "claim terms are normally used consistently throughout the patent." Phillips, 415 F.3d at 1314. Furthermore, differences in claims can also be enlightening. "For example, the presence of a dependent claim that adds a particular limitation gives rise to a presumption that the limitation in question is not present in the independent claim." Id. at 1314-15.

"The claims, of course, do not stand alone," but, rather, "'must be read in view of the specification, of which they are a part.'" Id. at 1315 (quoting Markman v. Westview Instruments, Inc., 52 F.3d 967, 979 (Fed. Cir. 1995) (en banc)); see also Vitronics, 90 F.3d at 1582 ("[T]he specification is always highly relevant to the claim construction analysis. Usually, it

8

is dispositive; it is the single best guide to the meaning of a disputed term."); Multiform Desiccants, 133 F.3d at 1478 ("The best source for understanding a technical term is the specification from which it arose, informed, as needed, by the prosecution history."). The specification, as required by statute, describes the manner and process of making and using the patented invention, and, therefore, "claims must be construed so as to be consistent with the specification." Merck & Co. v. Teva Pharms. USA, Inc., 347 F.3d 1367, 1371 (Fed. Cir. 2003); see 35 U.S.C. § 112 (requiring that the specification describe an invention in "full, clear, concise, and exact terms"). The Federal Circuit and Supreme Court have thus long emphasized the specification's important role in claim construction, noting that, usually, the specification "is dispositive," as it is "the single best guide to the meaning of the disputed term." Phillips, 415 F.3d at 1315 (quoting Vitronics, 90 F.3d at 1582); see Markman, 517 U.S. at 389 (referencing the "standard construction rule that a term can be defined only in a way that comports with the instrument as a whole"); Multiform Desiccants, 133 F.3d at 1478.

In addition to the claims and specification, the Court should consider the prosecution history, which consists of the complete record of the proceedings before the United States Patent and Trademark Office ("PTO"), including the prior art

cited during the examination of the patent and any subsequent reexaminations.   Phillips, 415 F.3d at 1317.   The prosecution history "provides evidence of how the PTO and the inventor understood the patent" and "can often inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be."   Id. (citing Vitronics, 90 F.3d at 1582-83); see also Chimie v. PPG Indus., Inc., 402 F.3d 1371, 1384 (Fed. Cir. 2005) (indicating that "the purpose of consulting the prosecution history" as part of claim construction is to exclude any "disclaimed" interpretation).   "At the same time, because prosecution history represents an ongoing negotiation between the PTO and the inventor, 'it often lacks the clarity of the specification and thus is less useful for claim construction purposes.'"   Trading Techs. Int'l, Inc. v. eSpeed, Inc., 595 F.3d 1340, 1352 (Fed. Cir. 2010) (quoting Netcraft Corp. v. eBay, Inc., 549 F.3d 1394, 1401 (Fed. Cir. 2008)).

The Court may also examine extrinsic evidence, which includes "all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises."   Markman, 52 F.3d at 980.   For example, technical dictionaries may provide the Court with a better understanding of the underlying technology and the way in which

one of skill in the art might use the claim terms. Phillips, 415 F.3d at 1318; see also Vitronics, 90 F.3d at 1584 n.6. General usage dictionaries may also be consulted, as they are "often useful to assist in understanding the commonly understood meaning of words" and "[a] dictionary definition has the value of being an unbiased source 'accessible to the public in advance of litigation.'" Phillips, 415 F.3d at 1322 (quoting Vitronics, 90 F.3d at 1585).[1] However, the Federal Circuit cautions that "'a general-usage dictionary cannot overcome art-specific evidence of the meaning' of a claim term," that "the use of the dictionary may extend patent protection beyond what should properly be afforded by the inventor's patent," and that "[t]here is no guarantee that a term is used in the same way in a treatise as it would be by the patentee." Phillips, 415 F.3d at 1322 (quoting Vanderlande Indus. Nderland BV v. Int'l Trade Comm'n, 366 F.3d 1311, 1321 (Fed. Cir. 2004)). Additionally,

---

[1] In Phillips, the Federal Circuit expressly discounted the approach taken in Texas Digital Systems, Inc. v. Telegenix, Inc., 308 F.3d 1193 (Fed. Cir. 2002), in which the court placed greater emphasis on dictionary definitions of claim terms. Phillips, 415 F.3d at 1319-20 ("Although the concern expressed by the court in Texas Digital was valid, the methodology it adopted placed too much reliance on extrinsic sources such as dictionaries, treatises, and encyclopedias and too little on intrinsic sources, in particular the specification and prosecution history."). The Phillips opinion reaffirmed the approach used in Vitronics, Markman, and Innova as the proper approach for claim construction, but acknowledged that there was "no magic formula," and that a district court is not "barred from considering any particular sources . . . as long as those sources are not used to contradict claim meaning that is unambiguous in light of the intrinsic evidence." Id. at 1324.

"different dictionaries may contain somewhat different sets of definitions for the same words. A claim should not rise or fall based upon the preferences of a particular dictionary editor, or the court's independent decision, uninformed by the specification, to rely on one dictionary rather than another." Id. Thus, "while extrinsic evidence 'can shed useful light on the relevant art,' [the Federal Circuit has] explained that it is 'less significant than the intrinsic record in determining "the legally operative meaning of claim language."'" Id. at 1317 (quoting C.R. Bard, Inc. v. U.S. Surgical Corp., 388 F.3d 858, 862 (Fed. Cir. 2004)).

With the foregoing principles in mind, the Court will now examine the patents and the disputed claim terms.

### III. ANALYSIS OF THE DISPUTED CLAIM TERMS

In advance of the Markman hearing conducted by this Court, the parties submitted a joint claim construction and prehearing statement that included one agreed-upon claim term and five disputed claim terms. ECF No. 31. The Court adopts the parties' stipulated construction of the agreed-upon term, with minor grammatical adjustments,[2] and addresses each of the

---

[2] Accordingly, the Court adopts the following construction:

    1) **"neutrally buoyant"** is construed to mean "neither rise nor sink when no propulsive force is applied."

disputed claim terms herein.[3]

### 1. *"flexible appendage"*

#### a. Proposed Constructions & Court Ruling

**SwimWays:** Plain and ordinary meaning. No construction required.

**Zuru:** "an appendage capable of bending"

**Court:** Plain and ordinary meaning. No construction required.

#### b. Discussion

The parties clarified at the <u>Markman</u> hearing that the dispute regarding this term centers on the definition of "flexible." Counsel for Zuru conceded at the <u>Markman</u> hearing that the phrase "capable of" is not vital to its proposed construction. And, as SwimWays has observed, Zuru's proposed

---

[3] The Court acknowledges the parties' dispute regarding whether the Court must affirmatively construe claim terms where only one party asserts that construction is necessary. <u>See</u>, <u>e.g.</u>, Def.'s Br. at 5-6, ECF No. 21; Pls.' Resp. Br. at 2, ECF No. 23. Recognizing that a "determination that a claim term 'needs no construction' or has the 'plain and ordinary meaning' may be inadequate when a term has more than one 'ordinary' meaning or when reliance on a term's 'ordinary' meaning does not resolve the parties' dispute," <u>O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co., Ltd.</u>, 521 F.3d 1351, 1360 (Fed. Cir. 2008) (citing <u>Phillips</u>, 415 F.3d at 1314), this Court follows the Federal Circuit's instruction to construe those claims "that are in controversy, and only to the extent necessary to resolve the controversy," <u>Vivid Techs., Inc. v. Am. Science Eng'g, Inc.</u>, 200 F.3d 795, 803 (Fed. Cir. 1999) (internal citations omitted). Accordingly, where "the parties present a <u>fundamental</u> dispute regarding the [meaning and] scope of a claim term," <u>O2 Micro</u>, 521 F.3d at 1362 (emphasis added), and where the plain and ordinary meaning of the term does not resolve that dispute, <u>see Finjan, Inc. v. Secure Computing Corp.</u>, 626 F.3d 1197, 1207 (Fed. Cir. 2010), "the court, not the jury, must resolve that dispute," <u>O2 Micro</u>, 521 F.3d at 1360.

construction merely repeats the term "appendage." See Pls.' Br. at 9, ECF No. 20.  Accordingly, because the Court need only construe the terms "that are in controversy, and only to the extent necessary to resolve the controversy," Vivid Techs., Inc. v. Am. Science Eng'g, Inc., 200 F.3d 795, 803 (Fed. Cir. 1999) (internal citations omitted), the Court focuses its discussion on the term "flexible."

Zuru asserts that its proposed construction is "consistent with the . . . '785 patent specification," "the plain meaning of the term as would be understood by one of ordinary skill in the art," and "the [Merriam-Webster] dictionary," which "defines flexible as 'capable of bending or being bent.'" Def.'s Br. at 8-9, ECF No. 21 (quoting Merriam-Webster.com at http://www. merriam-webster.com/dictionary/flexible).  In addition, Zuru contends, "the file history of the '785 patent shows that the term 'flexible appendage' is not unambiguous and that the patentee disputed the examiner's initial interpretation of the term." Def.'s Resp. Br. at 5, ECF No. 24.  SwimWays disagrees, arguing that the "plain and ordinary meaning" of the term "flexible" is sufficient because Zuru "merely substitutes one well-known term for another without providing any additional clarity," Pls.' Resp. Br. at 4, ECF No. 23, and because "an affirmative construction may . . . introduce unnecessary ambiguity into the jury's understanding of the [term]," Pls.'

14

Br. at 9, ECF No. 20. Furthermore, SwimWays contends that the patentee did not propose to the examiner any definition of "flexible" other than its plain and ordinary meaning. See id. at 8.

A careful review of the intrinsic evidence, namely the "words of the claims themselves, the remainder of the ['785] specification, [and] the prosecution history," Am. Piledriving Equip., Inc. v. Geoquip, Inc., 637 F.3d 1324, 1332 (Fed. Cir. 2011) (quoting Innova, 381 F.3d at 1116), reveals no special meaning beyond the plain and ordinary meaning of the term "flexible." The claims do not expressly define the term, one claim simply describing three "flexible appendage[s]" that are "configured to flex," '785 patent, 9:54-61, 10:3 (claim 18), and the remaining claims describing a "flexible appendage" with "the second end having a greater flexibility than the first end," id. at 8:43-44 (claim 1), 9:17-18 (claim 8), 10:26-27 (claim 22), 11:14-15 (claim 26), 12:9-10 (claim 31). The specification describes the "flexibility of the appendage," stating in the detailed description that the "appendage flexes or bends," "is flexing or bending," and "is configured to bend or flex." See, e.g., '785 patent, 2:14-15, 2:48-49, 4:41. The specification describes the "flexible material" as being "rigid enough to retain shape and form," "yet [] flexible enough to bend and flex." Id. at 4:58-61. The "flexibility of the appendage,"

described in the specification as causing, in part, "the appendage to flex or bend," id. at 2:36-39, evidences no attempt by the patentee to give the term "flexible" a meaning other than its plain and ordinary meaning.

The prosecution history also lends no support to Zuru's contention that construction is necessary because "the patentee made the effort to conduct a personal interview with the examiner in order to address the meaning of the term." Def.'s Resp. Br. at 5, ECF No. 24. To the contrary, the record shows that the patentee argued against the examiner's overly broad interpretation of the term "flexible" during prosecution, see, e.g., Def.'s Br., Ex. C at 198, ECF No. 22-3,[4] which lends additional support to the presumption favoring a plain and ordinary meaning. Indeed, it is well-settled that claim terms should not be given "a restrictive construction unless there is clear evidence to support it in the intrinsic evidence, or a broader meaning is specifically disclaimed during prosecution." Aventis Pharms. Inc. v. Amino Chems. Ltd., 715 F.3d 1363, 1375 (Fed. Cir. 2013) (citing Vitronics, 90 F.3d at 1582; Saunders Grp., Inc. v. Comfortrac, Inc., 492 F.3d 1326, 1331 (Fed. Cir.

---

[4] The examiner had originally rejected several of the patentee's claims based on prior art "disclos[ing] . . . a flexible appendage," where "flexible" was interpreted to mean "that [the appendage] can move from one direction to another direction," Def.'s Br., Ex. C at 161, ECF No. 22-3, which the Court views as an overly broad interpretation beyond the plain and ordinary meaning of flexible.

2007)). Moreover, in order to disclaim a particular construction during prosecution, a patentee must make "a <u>clear and unmistakable disavowal</u> of scope during prosecution" by, for example, "explicitly characteriz[ing] an aspect of his invention in a specific manner to overcome prior art." <u>Purdue Pharma L.P. v. Endo Pharm. Inc.</u>, 438 F.3d 1123, 1136 (Fed. Cir. 2006) (emphasis added); <u>see also</u> <u>Microsoft Corp. v. Multi-Tech Sys., Inc.</u>, 357 F.3d 1340, 1349 (Fed. Cir. 2004). Although it is fairly clear that patentee did "characterize an aspect of his invention" during prosecution, that characterization was consistent with the plain and ordinary meaning of flexible and was made specifically to disabuse the examiner of an overly broad interpretation. Accordingly, the Court finds no disavowal by the patentee of the scope of the plain and ordinary meaning of the term.

Nor does the extrinsic evidence reveal a meaning different from the plain and ordinary meaning. Zuru's proposed construction merely paraphrases the plain language of the term in a manner "<u>consistent</u> with the definition of flexible as provided by the dictionary." Def.'s Br. at 9, ECF No. 21 (emphasis added). This Court "question[s] [Zuru's] need to consult a dictionary to determine the meaning of such [a] well-known term[]." <u>C.R. Bard</u>, 388 F.3d at 863. "Indeed, . . . merely rephrasing or paraphrasing the plain language of a claim

by substituting synonyms does not represent genuine claim construction." Id. (internal quotation marks omitted). Accordingly, because claim construction regarding this term "involves little more than the application of the widely accepted meaning of commonly understood words," Phillips, 415 F.3d at 1314, the Court declines to construe the disputed term. See U.S. Surgical Corp. v. Ethicon, Inc., 103 F.3d 1554, 1568 (Fed. Cir. 1997) ("Claim construction . . . is not an obligatory exercise in redundancy.").

### 2. "coupled to said torso"

#### a. Proposed Constructions & Court Ruling

**SwimWays:** Plain and ordinary meaning. No construction needed.

> Alternatively: "connected to said torso, either directly or indirectly"[5]

**Zuru:** "connected directly to the torso"

**Court:** "connected to said torso, either directly or indirectly"

#### b. Discussion

The parties' dispute regarding this term hinges on the term "coupled to." The parties agree that the plain and ordinary meaning of "coupled to" anticipates a connection, but disagree as to whether the term anticipates both direct and indirect

---

[5] See Pls.' Resp. Br. at 6, ECF No. 23.

connections. Zuru, proposing a construction encompassing only a direct connection, asserts that "the claims require[] that the appendage must be connected directly to the torso without another element interposed between the appendage and the torso." Def.'s Resp. Br. at 7, ECF No. 24. Zuru also alleges that its construction is consistent with the "the plain meaning of the term as would be understood by one of ordinary skill in the art," as well as the '785 patent specification. Def.'s Br. at 9, ECF No. 21. SwimWays argues that the plain and ordinary meaning "encompass[es] both direct and indirect connection[s]" and, thus, is "broader than Zuru's proposed construction." Pls.' Br. at 9, ECF No. 20. In addition, SwimWays contends, "the specification clearly reveals that the term was intended to encompass indirect connections" and asserts that there is "no evidence of the patentee acting as his own lexicographer to redefine this term and limit it only to a direct connection." Id. at 10. Because neither party disputes the "said torso" portion of the disputed term, the Court construes only the disputed "coupled to" portion of the term. See U.S. Surgical Corp., 103 F.3d at 1568.

As a preliminary matter, the Court notes that the Federal Circuit has held that "the term 'coupled to' . . . should be construed broadly so as to allow an indirect attachment." Bradford Co. v. Conteyor N. Am., Inc., 603 F.3d 1262, 1270 (Fed.

Cir. 2010). Likewise, several district courts, including this Court, have determined that the plain and ordinary meaning of the term "coupled" anticipates both direct and indirect connections. See Asetek Holdings, Inc. v. Coolit Sys., No: C-12-4498, 2013 U.S. Dist. LEXIS 170488, at *17 (N.D. Cal. 2013) (concluding "in principle, . . . that the term 'coupled' - in isolation - could support either direct or indirect connections"); Silicon Image, Inc. v. Genesis Microchip, Inc., No. 3:01cv266, 2002 U.S. Dist. LEXIS 28916, at *88 (E.D. Va. 2002) (observing that the "common usage of the term 'couple' supports both direct and indirect connections"); Silicon Graphics, Inc. v. Nvidia Corp., 68 F. Supp. 2d 331, 346 (D. Del. 1999) (noting that "the ordinary and accustomed meaning of the term 'couple,' even when used in an electronics context does not solely mean 'directly coupled'" and "determin[ing] that the ordinary meaning in this context is 'coupled or connected, directly or indirectly'"). Thus, the Court must determine whether the patentee clearly disclaimed indirect connections from the scope of the term "coupled to."

A careful review of the intrinsic evidence, beginning with the claims in this case, reveals no "clear intention [of the patentee] to limit the claim scope" to exclude indirect connections. Innova, 381 F.3d at 1117 (observing that "claims will not be 'read restrictively unless the patentee has

20

demonstrated a clear intention to limit the claim scope using words or expressions of manifest exclusion or restriction'" (quoting Liebel-Flarsheim Co. v. Medrad, Inc., 358 F.3d 898, 905-09 (Fed. Cir. 2004)). Rather, the '785 patent claims simply describe various "appendage[s] coupled to said torso" and "drive[s] coupled to said torso and to said appendage[s]" without specifying whether those connections must be direct or indirect. See '785 patent at 8:1-21 (Claim 1); 8:54-9:1 (Claim 8); 10:24-29 (Claim 18); 10:24-28 (Claim 22); 10:53-54 (Claim 26); 11:21-24 (Claim 31).

Although the Court may not import limitations from the specification into the claim, it "can rely on the specification 'to understand what the patentee has claimed and disclaimed.'" SkinMedica, Inc. v. Histogen Inc., 727 F.3d 1187, 1196 (Fed Cir. 2013) (quoting SafeTCare Mfg., Inc. v. Tele-Made, Inc., 497 F.3d 1262, 1270 (Fed. Cir. 2007)); see also Aventis Pharms. Inc., 715 F.3d at 1373 (quoting Multiform Desiccants, 133 F.3d at 1478) ("The specification provides the 'best source' for construing a claim term and determining the inventor's intent regarding use."). Zuru asserts that the "embodiments shown and described in the '785 patent also necessitate Zuru's proposed construction," Def.'s Br. at 10, ECF No. 21 (emphasis added). However, mindful of the Federal Circuit's "warn[ing] against confining the claims to [the specification's] embodiments,"

21

*Phillips*, 415 F.3d at 1323,[6] the Court notes that, in any event, the embodiments contained and described in the '785 patent's specification appear to suggest both direct and indirect connections. For example, with respect to Figure 9, the specification provides:

> Projections (not shown) that are coupled to the torso 220 engage with the openings 266 to pivotally couple the appendage 260 to the torso 220. In alternative embodiments other coupling mechanisms, such as brads, rivets, etc., are used to pivotally couple the appendage to the torso.

'785 patent, 3:56-61. In this instance, the connection between the appendage and the torso appears to be a direct connection. The presence of "other coupling mechanisms, such as brads, rivets, etc.," does not change the connection from a direct one into an indirect one. With respect to the embodiment illustrated in Figures 14-16, the specification provides:

> In the illustrated embodiment, the arm appendages 510 and 520 are coupled to a front axle 512 that extends through the torso 420 and is pivotally coupled to the torso. Similarly, the leg appendages 530 and 540 are coupled to a rear axle 532 that extends through the torso 420 and is pivotally coupled to the torso. In the illustrated embodiment ends of each of the axles 512 and 532 are disposed within a portion of the appendages 510, 520, 530, and 540 to couple the appendages to the axles. In another embodiment another mechanism, such as an adhesive, is used to couple the appendages to the respective axles.

---

[6] *See also Martek Biosciences Corp. v. Nutrinova, Inc.*, 579 F.3d 1363, 1381 (Fed. Cir. 2009) (stating that "embodiments appearing in the written description will not be used to limit claim language that has broader effect").

'785 patent, 6:37-47.   Again, the appendages appear to be
directly connected to the axles — the presence of "an adhesive"
does not effect an indirect connection.

Conversely, however, the specification with respect to
Figure 1 provides:

> As illustrated schematically in FIG. 1, the toy figure
> 100 includes a torso 120, an appendage 160 coupled to
> the torso 120, and a drive 140 that is coupled to
> torso 120.   <u>A link 124, such as a drive shaft,
> operatively couples the drive 140 to the appendage
> 160</u>.

'785 patent, 2:1-5 (emphasis added).   In this embodiment, the
drive is "coupled to" the torso by means of an intermediary in
the form of a "link . . . such as a drive shaft." <u>Id.</u> Unlike
the coupling mechanisms in the direct connections discussed
above, which appear to serve no other purpose except to connect
the elements, the drive shaft in this embodiment has its own
function, independent of its additional connective function.
Thus, the drive shaft is, in effect, an indirect connection
between the drive and the appendage.   <u>Id.</u> Accordingly, the
Court determines that the specification does not disclaim
indirect connections from the scope of the term "coupled to"
but, in fact, specifically contemplates their use.   Furthermore,
the Court determines that the embodiments are "merely exemplary"
of this understanding and do not function to define the outer
limit of the scope of the disputed term as anything other than

23

the plain and ordinary meaning.  <u>Phillips</u>, 415 F.3d at 1323.  As there has been no disavowal of the scope of this term during prosecution, the scope of the claim, as expressed in the claims and specification, controls.

Therefore, having carefully considered the parties' proposed constructions and the arguments advanced at the <u>Markman</u> hearing, and finding no disavowal of the term's scope by the patentee in the claims, specification, or prosecution history, the Court "construe[s] ['coupled to'] broadly so as to allow an indirect attachment."  <u>Bradford</u>, 603 F.3d at 1270.

### 3. *"configured to propel the figure through the liquid"*

#### a. <u>Proposed Constructions & Court Ruling</u>

**SwimWays:** Plain and ordinary meaning.  No construction required.

**Zuru:** "The appendage is capable of applying a driving force to the figure."

**Court:** Plain and ordinary meaning.  No construction required.

#### b. <u>Discussion</u>

The parties dispute two aspects of this term.  First, the parties disagree as to whether the Court should construe the term or adopt the plain and ordinary meaning of the term "propel."  SwimWays asserts that "the claim term is clear upon its face to a person of ordinary skill in the art" and that the patentee did not intend to define the term as "anything other

than its plain and ordinary meaning." Pls.' Br. at 11, ECF No. 20. Zuru asserts that its proposed construction is consistent with "the plain meaning of the term," "the '785 patent specification," and the "definition of 'propel' as provided by the [Merriam-Webster] dictionary," which "defines propel as 'to drive forward or onward or as if by means of a force that imparts motion.'" Def.'s Br. at 14-15, ECF No. 21 (quoting Merriam-Webster.com at http://www.merriam-webster.com/dictionary/propel). Second, the parties dispute whether the plain and ordinary definition of "configured to" includes more than mere capability. SwimWays asserts that the "fact that an appendage may be capable of applying some unspecified 'driving force' to the figure does not necessarily indicate that it is 'configured to propel the figure through the liquid.'" Pls.' Resp. Br. at 6, ECF No. 23 (emphasis added). Zuru counters that the '785 "specification explains that an appendage that is configured to propel the figure through liquid is an appendage that is capable of applying a driving force to the figure." Def.'s Resp. Br. at 8, ECF No. 24 (emphasis added). Zuru adds that, "[w]hile the word 'propel' may have a plain and ordinary meaning, this plain meaning does not provide guidance about the scope of what it means to be 'configured' to propel a figure through liquid." Id.

25

### i. "propel"

A careful review of the intrinsic evidence, namely the "words of the claims themselves, the remainder of the ['785] specification, [and] the prosecution history," _Am. Piledriving Equip._, 637 F.3d at 1332, reveals no special meaning other than the plain and ordinary meaning of the term "propel." The claims do not expressly define the term, but simply describe an "appendage [that] is configured to propel the figure through the liquid," '785 patent at 8:48-49 (claim 1), 8:56-57 (claim 8), 11:22-23 (claim 31), a "figure configured to be . . . propelled through water, _id._ at 10:20-21 (claim 22), and a "figure . . . propelled through a liquid," _id._ at 10:57-58 (claim 26), 11:17-18 (claim 31). The remainder of the specification, without expressly defining "propel," describes how the figure is propelled. The specification states that the "drive is configured to produce a force sufficient to move the appendage with respect to the torso." _Id._ at 1:61-63; _see also id._ at 8:61-9:7, 11:25-27 ("drive configured to produce forces on said torso and on said . . . appendage[s] sufficient to produce cyclical relative motion between said . . . appendage[s] and said torso"); _id._ at 10:29-33 ("drive being configured to produce forces on said torso and said appendage sufficient to produce reciprocating pivotal motion between said appendage and said torso"). The specification elucidates that it is the

26

"relative motion and the flex of the appendage [that] effectively propel the toy figure through the liquid." Id. at 1:64-66; see also id. at 2:4-5. The prosecution history reveals that, although the patentee added the phrase "said appendage configured to propel the figure through the liquid" to the "figure of claim 1" during prosecution, the patentee made no effort to further define "propel" beyond its plain and ordinary meaning. Def.'s Br., Ex. C at 188, ECF No. 22.

Nor does the extrinsic evidence "'shed useful light on the relevant art.'" Phillips, 415 F.3d at 1317 (quoting C.R. Bard, 388 F.3d at 862). Zuru merely proposes a construction that is "consistent with the definition of 'propel' as provided by the dictionary," Def.'s Br. at 15, ECF No. 21, and appears to concede that "the word 'propel' may have a plain and ordinary meaning," Def.'s Resp. Br. at 8, ECF No. 24. Again, this Court "question[s] [Zuru's] need to consult a dictionary to determine the meaning of such [a] well-known term[]." C.R. Bard, 388 F.3d at 863. Because claim construction regarding this term "involves little more than the application of the widely accepted meaning of commonly understood words," Phillips, 415 F.3d at 1314, the Court declines to construe the disputed term.

### ii. "configured to"

At the Markman hearing, counsel for SwimWays asserted that "configured to" implies an arrangement in a manner to achieve

27

this result under a certain set of circumstances. Counsel for Zuru argued that the disputed claim term uses "pseudo-functional" language, describing neither a functional limitation, i.e., that the appendage propels the figure when placed in the liquid, nor a structural limitation, i.e., proscribing the shape or size or arrangement of the drive that does the propelling. Thus, Zuru's counsel argued, the construed term should describe either a structure that propels or the performance of the structure when placed in liquid. To remedy such ambiguity, counsel proposed a construction specifying that the appendage is "capable of" applying a driving force when placed in the liquid. However, replacing "configured to" with "capable of," as Zuru proposes, clarifies neither the structure nor the function of the figure or its appendage. Moreover, a construction that an appendage is merely "capable" of propelling a figure through a liquid fails to adequately convey that the appendage is actually "configured to" propel the figure through the liquid. See, e.g., Typhoon Touch Techs., Inc. v. Dell, Inc., 659 F.3d 1376, 1380 (Fed. Cir. 2011) (distinguishing between a device configured to perform a certain function and a device that is simply capable of being configured to perform that function).

Although the claims themselves do not expressly define "configured to," a consideration of "the remainder of the ['785]

specification" is instructive. Am. Piledriving Equip., 637 F.3d at 1332.  Keeping in mind the presumption that "the same claim term in the same or related patents carries the same construed meaning," Omega Eng'g, 334 F.3d at 1334, the Court considers the use of "configured to" elsewhere in the '785 patent, as well as "the context of the surrounding words," ACTV, Inc. v. Walt Disney, Co., 346 F.3d 1082, 1088 (Fed. Cir. 2003); see also Phillips, 415 F.3d at 1314.  The claims describe a figure "configured to be substantially neutrally buoyant," as well as one that is "configured to be at least partially immersed" in a liquid.  See '785 patent at 8:45-51; 9:50-51; 10:20-21; 10:57-58; 11:16-17; 12:28-30.  The detailed description of the specification states that "the toy figure is configured to be placed in a liquid, such as water."  Id. at 1:60-64.  It describes one embodiment of the figure that "is configured to float when . . . it is placed in water," id. at 7:44-45, and another embodiment that "is configured to sink when placed in water," id. at 7:47-48.  Yet another embodiment "is configured to be suspended at a range of depths when the toy turtle is placed in water."  Id. at 7:49-51.  In these instances, interpreting "configured to" as "capable of" would render these descriptions and claims "virtually devoid of meaning." Sipco, LLC v. Abb, Inc., No. 6:11-CV-0048, 2012 U.S. Dist. LEXIS 106659, at *33, 2012 WL 3112302, at *11 (E.D. Tex. July 30,

29

2012) (observing that "[i]nterpreting 'configured to' as requiring only mere capability would eliminate any meaningful limits to the claims"); see also Agilent Techs., Inc. v. Affymetrix, Inc., 567 F.3d 1366, 1378 (Fed. Cir. 2009)(rejecting the construction of a closed chamber "adapted to" as meaning "capable of" because "the closed chamber is not merely capable of being set apart from its surroundings - it is in fact set apart."); Prism Techs., LLC v. Adobe Sys., No. 8:10CV220, 2012 U.S. Dist. LEXIS 17860, 34-38, 2012 WL 381868 (D. Neb. Feb. 14, 2012) (construing "adapted to" to mean "configured to," "because 'adapted to' does not mean the same thing as 'capable of.'"). It cannot be the case that the patentee intended to describe a toy figure merely "capable of" being placed in a liquid. Indeed, it is hard to imagine a figure that is not capable of being so placed. Likewise, it is difficult to imagine that the patentee intended to describe a figure that was merely "capable of" floating, sinking, or one capable of being "substantially neutrally buoyant" or "partially immersed in" a liquid.

A review of the extrinsic evidence further confirms that Zuru's proposed construction is not consistent with the plain and ordinary meaning of "configured to." Although Zuru cites no dictionary definition for "configure," the dictionary cited by Zuru for the terms "flexible," Def.'s Br. at 9, ECF No. 21, "coupled," id. at 14, "propel," id. at 15, "flex," id. at 18,

30

and "planar," id., defines "configure" as "to arrange or prepare (something) so that it can be used," Configure Definition, Merriam-Webster.com, http://www.merriam-webster.com/dictionary /configure (last visited Feb. 25, 2014). Moreover, none of the general-usage dictionaries consulted by the Court defines "configure" as to render merely "capable of."[7]

Accordingly, because "[i]nterpreting 'configured to' as requiring only mere capability would eliminate any meaningful limits to the claims," Abb, 2012 U.S. Dist. LEXIS 106659, at *33, the Court "hereby construes 'configured to' as having its plain and ordinary meaning, which the Court understands to require not merely being capable of being configured but rather being actually configured," Sipco, LLC v. Amazon.com, Inc., No. 2:08-cv-359, 2012 U.S. Dist. LEXIS 150940, at *144, 147 (E.D. Tex. Oct. 19, 2012).

---

[7] The Court considered several general-usage dictionaries, none of which define "configure" as to render "capable of." See Webster's Third New International Dictionary (1987 ed.), unabridged (defining "configure" as: "1: to shape according to some model: cause to conform. 2: to arrange in a certain form, figure, or shape: give a configuration to"); Merriam Webster's Collegiate Dictionary (10th ed. 1997) (defining "configure" as: "to set up for operation esp. in a particular way"); The Compact Oxford English Dictionary (2d ed. 1991) (defining "configure" as: "1. To fashion according to something else as a model; to conform in figure or fashion. 2. To represent by a figure or image, to figure. 3. To fashion by combination and arrangement; to give an astrological configuration to; to put together in a certain form or figure. 4. Computing. To choose or design a configuration for; to combine (a program or device) with other elements to perform a certain task or provide a certain capability.").

*4. "configured to flex in response to said drive producing the relative motion" AND "configured to flex into a non-planar configuration in response to said drive producing the relative motion"*

### a. Proposed Constructions & Court Ruling

**SwimWays:** Plain and ordinary meaning. No construction required.

**Zuru:** "The appendage is capable of bending such that the entire appendage is not in a single plane."

**Court:** "configured to bend, in response to the motion produced by said drive, such that the entire appendage is not in a single plane."

### b. Discussion

At the Markman hearing, the parties agreed to the following construction proposed by the Court regarding the disputed term: "appendage bends, in response to the motion produced by said drive, such that the entire appendage is not in a single plane." Because a court need only construe claims "that are in controversy, and only to the extent necessary to resolve the controversy," Vivid Techs., 200 F.3d at 803, the Court adopts the construction agreed upon by the parties at the February 18, 2014 Markman hearing, with minor adjustments reflecting the grammatical form of the original term. If either party objects to the construed term as adjusted by the Court, that party is **ORDERED** to submit its objection and supporting brief within

32

seven (7) days of the issuance of this Opinion and Order.

## 5. *"cause said appendage to have a wave-like whipping motion"*

### a. Proposed Constructions & Court Ruling

**SwimWays:** Plain and ordinary meaning. No construction required.

**Zuru:** "The appendage is capable of moving such that second portion of the appendage lags behind the movement of a first portion of the appendage."

**Court:** "cause said appendage to move in a whipping fashion, such that a portion of the appendage lags behind the movement of another portion of the appendage that is closer to the torso"

### b. Discussion

The crux of the parties' dispute is whether the patentee acted as a lexicographer with regard to this term. SwimWays contends that the disputed term requires no construction because the term's "description of the appendage's motion . . . is an apt and intuitively-understandable one." Pls.' Br. at 13, ECF No. 20. Zuru disagrees, arguing that the term "does not have a plain and ordinary meaning," but is instead "an ambiguous conglomeration of metaphors" that "is really only understandable 'when read in light of the specification'" and, thus, "requires construction to meaningfully determine the scope of the claim." Def.'s Resp. Br. at 10, ECF No. 24 (quoting Pls.' Br. at 13, ECF No. 20). Zuru asserts that its proposed construction of the term is "consistent with . . . the '785 patent specification as well as the plain meaning of the term as would be understood by

one of ordinary skill in the art." Def.'s Br. at 19, ECF No. 21.

Patent law allows a patentee to be a lexicographer, meaning that he "may use terms in a manner contrary to or inconsistent with one or more of their ordinary meanings." Vitronics, 90 F.3d at 1582 (quoting Hormone Research Found., Inc. v. Genentech, Inc., 904 F.2d 1558, 1562 (Fed. Cir. 1990)). However, "[t]o act as its own lexicographer, a patentee must 'clearly set forth a definition of the disputed claim term' other than its plain and ordinary meaning," Thorner v. Sony Computer Entm't Am. LLC, 669 F.3d 1362, 1365 (Fed. Cir. 2012) (quoting CCS Fitness, Inc. v. Brunswick Corp., 288 F.3d 1359, 1366 (Fed. Cir. 2002)), indicating an "'express intent to impart a novel meaning,'" Schering Corp. v. Amgen Inc., 222 F.3d 1347, 1353 (Fed. Cir. 2000) (quoting York Prod., Inc. v. Cent. Tractor Farm & Family Ctr., 99 F.3d 1568, 1572 (Fed. Cir. 1996)). Any special meaning must appear with "reasonable clarity, deliberateness, and precision" in the specification or prosecution history. Abbott Labs. v. Syntron Bioresearch, Inc., 334 F.3d 1343, 1354 (Fed. Cir. 2003) (emphasis omitted) (quoting In re Paulsen, 30 F.3d 1475, 1480 (Fed. Cir. 1994)).

The disputed term appears throughout the claims. In all but one claim, the "wave-like, whipping motion" is described substantially the same way, with minor variations: "said

34

appendage flexes in a direction opposite to that of the motion
of said appendage during at least a portion of the reciprocating
pivotal motion, the flex of the appendage and the reciprocating
pivotal motion cause said appendage to have a wave-like,
whipping motion." '785 patent, 12:13-18; accord id. at 8:29-34,
9:19-26, 10:34-39, 11:1-7; but see id. at 10:9-12 ("the motion
of said appendages with respect to said torso cause the
appendages to have a wave-like whipping motion").

Because "wave-like, whipping motion" may evoke multiple and
potentially ambiguous interpretations, the Court also considers
the "remainder of the ['785] specification," Am. Piledriving
Equip., 637 F.3d at 1332, including the "drawings and
corresponding discussion in the written description," Desper
Prods. v. QSound Labs., Inc., 157 F.3d 1325, 1336 (Fed. Cir.
1998), to determine the definition intended by the patentee.
The '785 patent's specification provides an in-depth textual
description of the movement of the appendage relative to the
torso. Referring to Figures 3-7, the written description
describes each stage of movement as visually illustrated in the
figures:

> Fig. 3 shows the . . . figure 100 in a first stage of
> the relative motion. In the first stage, the
> appendage 160 is pivoting in a first direction A with
> respect to the torso 120 . . . [and] both the flexible
> portion 164 and the rigid portion 162 of the appendage
> move in direction A. The flexibility of the appendage
> 160 and the resistance of the liquid, however, cause

the flexible portion 164 of the appendage 160 to flex or bend in a direction opposite to that of the movement of the appendage.

Fig. 4 shows . . . the second stage, [where] the appendage 160 has reversed its direction and is pivoting in a second direction B with respect to the torso 120. The rigid portion . . . has also reversed its direction and is moving in the second direction B. The flexible portion . . . , however, is still moving in the first direction A. In this second stage, the flexible portion . . . is flexing or bending in the same direction as that of the motion of at least a portion of the appendage. Fig. 5 shows . . . the third stage, [where] the appendage 160 [including the rigid portion 162 of the appendage] is still pivoting in the second direction B. . . . The flexible portion 164 of the appendage 160, however, has changed its direction and is moving in the second direction B . . . [and] is also flexing or bending in an [sic] direction opposite to that of the movement of the appendage.

Fig. 6 shows . . . the fourth stage, [where] the appendage 160 has changed its direction and is again pivoting in the first direction A. The rigid portion 162 of the appendage 160 has also changed its direction and is again moving in the first direction A. The flexible portion 164 of the appendage 160, however, is still moving in the second direction B . . . [and] is flexing or bending in the same direction as that of the motion of at least a portion of the appendage. Fig. 7 shows . . . the fifth stage, [where] the appendage is still pivoting in the first direction A. The flexible portion 164 of the appendage 160, however, has changed its direction and is again moving in the first direction A . . . [and] is also flexing or bending in a direction opposite to that of the movement of the appendage.

Id. at 2:30-3:12. The specification likens the movement of the

appendage to "a wave-like, whipping motion," explaining that,

"[b]ecause the flexible portion 164 of the appendage 160 flexes

and bends as the appendage 160 moves with respect to the torso

36

120, the movement of the flexible portion constantly lags the motion of the rigid portion 162 of the appendage." Id. at 3:13-19. Thus, although the patentee may not have intended to act as a lexicographer, the specification "'clearly set[s] forth a definition of the disputed claim term' other than its plain and ordinary meaning," Thorner, 669 F.3d at 1365 (quoting CCS Fitness, Inc., 288 F.3d at 1366), with "reasonable clarity, deliberateness, and precision," Abbott Labs., 334 F.3d at 1354.

Heeding the warning of the Federal Circuit "against confining the claims to [specific] embodiments" described in the specification, Phillips, 415 F.3d at 1323 (citing Nazomi Commc'ns, Inc. v. ARM Holdings, PLC, 403 F.3d 1364, 1369 (Fed. Cir. 2005)), the Court observes that the remaining embodiments described in the '785 patent's specification likewise refer to Figures 3-7 and the textual description of those figures as the standard for each embodiment's "wave-like, whipping motion." See, e.g., '785 patent, 4:42-45 (explaining that the motion of "the toy reef fish 200 has substantially the same wave-like motion that is described above and illustrated in Figs. 3-7"); 5:59-64 (same regarding "toy koi fish 300"); 7:26-27 (same regarding "toy turtle 400"). Furthermore, in all but one claim, the disputed term follows a claim limitation specifying that the appendage move in the manner described and illustrated in Figures 3-7 or that the appendage move pivotally with respect to

the torso, which comports with the embodiments referenced above. See '785 patent, 8:29-34; 9:19-26; 10:34-39; 11:1-7; 12:11-18 (citing substantially identical language that "said appendage flexes in a direction opposite to that of the motion of said appendage during at least a portion of the [motion], the flex of the appendage and the [motion] cause said appendage to have a wavelike whipping motion"); but see id. at 10:9-12 (making no limitations on the movement of the appendage except that "the motion of said appendages with respect to said torso cause the appendages to have a wave-like whipping motion."). Therefore, considering the context in which the disputed term is used, the Court finds that the "wave-like, whipping motion" as described and illustrated in Figures 3-7 would be understood by a person having ordinary skill in the art, not as merely exemplary, but as a definition of the outer limit of the claim. Phillips, 415 F.3d at 1323.

Accordingly, the Court construes the disputed term in a manner consistent with the '785 patent's explanation in the specification that "the movement of the flexible portion constantly lags the motion of the rigid portion 162 of the appendage." '785 patent at 3:13-19.

## IV.  CONCLUSION

For the reasons set forth above, the Court issues this Opinion and Order as the construction of the disputed claim terms in the '785 patent.

The Clerk is **REQUESTED** to send a copy of this Opinion and Order to counsel of record for the parties.

It is so **ORDERED**.

_____ /s/
Mark S. Davis
UNITED STATES DISTRICT JUDGE

Norfolk, Virginia
March 10 , 2014